T.C. Memo. 2001-271

UNITED STATES TAX COURT

CERAND & COMPANY, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent[*]

Docket No. 2767-97.          Filed October 9, 2001.

Gerard A. Cerand (an officer), for petitioner.

Gregory S. Matson and Warren P. Simonsen, for respondent.

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, Judge:  This case was remanded for further
proceedings by the Court of Appeals for the District of Columbia
Circuit.  Cerand & Co. v. Commissioner, 254 F.3d 258 (D.C. Cir.

_____

[*] This opinion supplements a previously released opinion,
Cerand & Co. v. Commissioner, T.C. Memo. 1998-423.

2001) (Cerand II).  In T.C. Memo. 1998-423 (Cerand I), we held that the advances petitioner made to sister corporations were equity and not debt as claimed by petitioner. In Cerand II, the Court of Appeals held:

> In the present case, we hold that the [Tax Court] abused its discretion in assessing the evidence.  The critical flaw in the [Tax Court's] analysis is its failure, despite the taxpayer having pressed the point, to consider * * * [petitioner's] contemporaneous treatment of sums received from its sister corporations as in part the payment of "interest," taxable as income to * * * [petitioner].  Over a period of several years, * * * [petitioner] received $414,220 from the three [sister] corporations, of which it booked more than $175,000 as interest income.  Even though * * * [petitioner] had taxable income in only two of the years in question (1986 and 1987), treatment of the repayments as income in other years reduced the amount of net operating loss * * * [petitioner] could carry forward into years when it had taxable income.
>
> Although the [Tax Court] abused its discretion by omitting from its analysis a highly significant bit of evidence, we cannot say that, had the [Court] properly weighed this evidence, it necessarily would have reached a different conclusion, because we do not know what weight it assigned to the other evidence. Therefore, we remand this case for the [Tax Court] to weigh all the evidence in the first instance.
>
> We also note that the [Tax Court] placed considerable weight upon the lack of documentation indicating that the transfers of funds from * * * [petitioner] to its sister corporations were loans. Because there were no documents recording the transfers there necessarily were no stated maturity dates, no repayment schedules, and no set interest rates.  As the Seventh Circuit recently observed in similar circumstances, "it is hazardous to say * * * that an investment must be equity because it is not documented as debt; lack of documentation does not help us choose."  J & W Fence Supply Co. v. United States, 230 F.3d 896, 898 (2000). * * * [Petitioner] does not raise

this argument, however, and we therefore do not consider it.

Based on the above-quoted holding, we understand the Court of Appeals' remand to require this Court to provide further explanation of our holding, with emphasis on the weight given to petitioner's treatment of repayments and interest accruals.

FINDINGS OF FACT

Findings in Earlier Opinion

In Cerand I, we found the following facts concerning the interest accruals and repayments by petitioner's three sister corporations:

> From time to time, the three corporations made cash repayments, or book entry credit was made to the advances for services rendered to petitioner. While the corporations were viable, they repaid $414,220 to petitioner. Petitioner accrued interest only sporadically on the advances to two of the corporations and failed to accrue any interest against the advances to the third, contrary to the advice of Mr. Cerand's tax adviser. The interest that petitioner did accrue on its books was rolled over annually into a note receivable and reported as income by petitioner. Because that income was never actually received by petitioner, respondent has allowed a deduction against ordinary income for that amount.

Additional Findings in Record That Support the Above-Quoted Findings

Petitioner began advancing funds to its three sister corporations in 1984 and over an 8-year period advanced $1,413,374.17. One of the sister corporations had advances outstanding for 8 years, and the other two each had advances

outstanding for 7 years. Accordingly, among the three sister corporations, advances were outstanding to petitioner for a total of 22 annual accounting periods. Petitioner accrued and reported interest income with respect to 8 of the 22 accounting periods. No interest was accrued or reported with respect to 14 of the 22 annual accounting periods. The total amount of interest accrued and reported by petitioner for the period 1984 through 1991 was $175,662. No amount of the accrued and reported interest was paid by the sister corporations. Instead, it was rolled over into a note receivable each year.

The reported interest was sporadic in amount and also varied as a percentage of the outstanding amount of advances. Treating the cumulative advances[1] outstanding annually for each sister corporation as the denominator and the amount of reported interest as the numerator,[2] the following percentage rate of interest would result:

---

[1] The outstanding annual cumulative advances used take into account increases for advances and reductions for any payments or credits during the year.

[2] No interest income was accrued or reported by petitioner with respect to one of the three sister corporations--Cerand Aviation

| Sister Corp. | Year | Cumulative Advances | Interest Reported | Percent |
|---|---|---|---|---|
| First World | 1984 | $10,260 | $1,160 | 11.3 |
| First World | 1985 | 111,129 | 7,194 | 6.5 |
| First World | 1986 | 271,094 | 13,965 | 5.2 |
| First World | 1987 | 496,153 | 31,288 | 6.3 |
| First World | 1988 | 654,077 | 51,349 | 7.8 |
| First World | 1989 | 808,333 | 65,206 | 8.1 |
| Airport Ser. | 1987 | 48,866 | 2,416 | 4.9 |
| Airport Ser. | 1988 | 65,650 | 3,084 | 4.7 |

Throughout the 8-year period the amount of outstanding advances was increasing, the amount of repayment was decreasing, and no amount of interest was paid by the sister corporations. Instead of being paid, any interest accrued by petitioner was merely rolled over annually into a note receivable. As the sister corporations' revenues decreased, advances from petitioner generally increased, reflecting a lack of concern about the possibility of repayment. Petitioner continued to advance funds to its three sister corporations even though conditions worsened, and the likelihood of repayment diminished. The three sister corporations did not seek financing from outside sources.

The three sister corporations made a total of $414,220 in repayments, which petitioner applied to the outstanding open "account receivable". The repayment amounts were sporadic, and they were not uniform in amount. For example, during 1986 petitioner advanced $151,000 to First World Corp. and $5,000 was repaid. In the next year (1987), $184,600 was advanced, and nothing was repaid. During the following year (1988) $163,025

was advanced and $57,650 was repaid.  The three sister corporations failed to file corporate Federal income tax returns for the years under consideration.

OPINION

To decide whether advances constitute debt or equity, we are to make a factual inquiry into whether a taxpayer has shown a bona fide debtor-creditor relationship.  Calumet Indus., Inc. v. Commissioner, 95 T.C. 257 (1990); Segel v. Commissioner, 89 T.C. 816, 827 (1987).  Although bona fide debt may exist between related parties, such transactions between related parties are to be subjected to particular scrutiny.  In re Uneco, Inc., 532 F.2d 1204, 1207 (8th Cir. 1976).  The determination of whether advances to a corporation have created bona fide indebtedness depends on whether there is an intention to create an unconditional obligation to repay the advances.  See Raymond v. United States, 511 F.2d 185, 190 (6th Cir. 1975).

In Cerand I, we identified 13 factors used by courts to assist them in deciding whether particular advances constituted debt or equity.  We noted that the factors are not equally significant and that no factor is determinative or relevant in each case.  John Kelly Co. v. Commissioner, 326 U.S. 521, 530 (1946); Estate of Mixon v. United States, 464 F.2d 394, 402 (5th Cir. 1972).  Finally, we recognized that the factors used are only aids in our analysis of whether the advances (1) constitute

risk capital entirely subject to the fortunes of the corporate venture or (2) represent a debtor-creditor relationship that comports with economic reality. Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); Litton Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973).

In Cerand I we identified the relevant facts and then analyzed them in three generalized categories, each of which included several of the 13 factors. In compliance with the Court of Appeals' mandate, we express in greater detail the factors considered in reaching our decision that the advances were equity rather than debt.

The record generally reflects that petitioner's advances created equity in its sister corporations. Although not a decisive factor, no certificates evidencing indebtedness were prepared or executed by or between petitioner and its three sister corporations to which the advances were made. Also, the owner, Gerald A. Cerand, was not issued shares of stock in the three newly created corporations to which the advances were made.

With regard to petitioner's expectation of interest and payments, there was no fixed date or schedule for repayment of the advances. Petitioner could look only to revenues/profits of the three sister corporations for repayment of the advances and/or the payment of interest. Although petitioner contends that it had a right to enforce payment from its sister

corporations, petitioner's only effort to enforce collection occurred after it was clear that the sister corporations had failed and were to become defunct, whereupon petitioner recovered the only remaining asset--the cash value of a life insurance policy on Mr. Cerand.

Control of petitioner and its three sister corporations rested with Mr. Cerand. He was the sole shareholder of petitioner, the alleged creditor, and he was also the sole shareholder of all three sister corporations, the alleged debtors. Mr. Cerand in conjunction with petitioner as the equity investor in its sister corporations, not only participated in the management, but controlled all aspects of all four corporations.

Although petitioner contended it was the intent of the parties to create debt, the alleged debt would have been subordinate to any creditors the three sister corporations may have had, because petitioner did not take the usual or ordinary precautions to ensure its position vis-a-vis unrelated creditors.

Essentially, petitioner bankrolled a group of startup corporations. If we accepted petitioner's characterization that all advances were loans, then the startup equity or capital was less than thin--it was nonexistent. This may explain why petitioner and its related entities did not try to obtain credit from outside sources. Petitioner's advances were used, initially as startup capital and later for the operation and overhead of

the three entities' businesses. Moreover, the advances made by petitioner were completely dependent upon the success of startup companies, none of which had prior business history, security, assets, or other guaranties of repayment. And finally, petitioner's sister corporations repaid only a small percentage of the advances.

As we noted in Cerand I, some of the factors usually considered by lenders such as capitalization, risk, the availability of financing from outside sources, and the use to which advances are put can help to identify whether the transaction was within the realm of economic reality. "[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the same terms." Segel v. Commissioner, 89 T.C. 816, 828 (1987). Here, petitioner accrued and reported a relatively small percentage of the interest that would have accrued if the advances were truly debt. No interest was paid to petitioner by the sister corporations. Instead, the accruals were rolled over annually into a note receivable. Even if the $175,662 of interest reported by petitioner had been paid to it by the sister corporations, the amount of interest that was accrued and reported does not comport with economic reality in the context of a creditor-debtor relationship.

During the 8-year period under consideration, petitioner's advances to the three sister corporations totaled $1,413,374.17. During that same period, the three sister corporations repaid $414,220. Accordingly, approximately 29 percent of the total amount advanced by petitioner was repaid by the sister corporations. The repayments were sporadic, not uniform in amount, and depended upon the ability of the sister corporations to pay. For example, in 1986 petitioner advanced $151,000 to First World Corp., and $5,000 was repaid. In the next year (1987) $184,600 was advanced, and nothing was repaid. In the following year (1988) $163,025 was advanced, and $57,650 was repaid. Petitioner continued to advance funds to the sister corporations in generally increasing amounts even though the relative amount of repayment and ability to repay were steadily decreasing.

Petitioner did accrue and report $175,662 as interest income over the 9-year period, 1984 through 1992. Interest income, however, was accrued and reported only for one sister corporation for its 1984 through 1989 years and for another for its 1987 and 1988 years. Accordingly, petitioner accrued and reported interest income in only 8 of 22 annual accounting periods of the sister corporations--approximately one-third of the time.

When interest was accrued and reported, it was not uniform in amount or percentage. As calculated previously, the rate or

percentage of the interest accrued and reported, based on the cumulative outstanding yearend balances, ranged from a low of 4.7 percent to a high of 11.3 percent. Using a weighted average for the eight accruals of interest, the average rate of interest accrued would have been 7.3 percent. If interest at 7.3 percent had been accrued and reported on all of the outstanding cumulative balances of the sister corporations, petitioner would have reported approximately $400,000.[3]

If a creditor would have charged 7.3 percent interest during the period under consideration, then petitioner by reporting $175,622 in interest reported approximately 44 percent of the interest that should have been accrued.[4] The apparent rate of interest accrued by petitioner, however, appears to be far below the going rate. During the early 1980s, the prime rate was in a precipitous climb and would eventually exceed 20 percent before the end of the decade. See, e.g., Finkelman v. Commissioner,

---

[3] These amounts were calculated from Exhibit 21-U by adding the outstanding balances for 22 accounting periods--eight for First World Corp. and 7 each for Cerand Aviation Inc. and Airport Services Corp. and then applying simple interest at 7.3 percent. It should be noted that with respect to Airport Services Corp., no advances were made after its 1988 year, but it did not become defunct until sometime in 1990. Accordingly, its $65,650 cumulative balance was considered outstanding for 1989 and 1990.

[4] Because petitioner accrued interest only in 8 of 22 accounting periods, the interest being accrued is essentially on a simple interest basis; i.e., interest was not accrued or added to the cumulative balances for 14 of 22 accounting periods.

T.C. Memo. 1989-72.  It was not unusual for interest rates during the period under consideration to be in the 20 to 24 percent range.  See, e.g., Goldstein v. Commissioner, 89 T.C. 535, 548 (1987); Bruce v. Martin, 845 F. Supp. 146 (S.D.N.Y 1994); In re Presque Isle Apartments, L.P., 118 Bankr. 332 (Bankr. W.D. Pa. 1990).  A third-party creditor would not have advanced funds to the sister corporations at a preferred rate (less than 10 percent), considering the fact that they were startup companies without a business performance record, assets, security, guaranties, etc.  If we assume a 10-percent rate, the total interest accruable would have been almost $550,000.  At 15 percent, the interest accruable would have approached $825,000.[5] If we assumed a 10-percent annual rate of compound interest, the accrual for the cumulative advances for all 22 accounting periods would have been an amount approaching $600,000.  Accordingly, in perspective, petitioner accrued and/or reported only a small percentage of the amount of interest that would have been due to an unrelated creditor during the years under consideration.

Petitioner's accountant/tax adviser recommended that interest be accrued and reported for all years.  We do not know why petitioner did not take that advice.  Petitioner has not provided any explanation as to why it failed to accrue or report

---

[5] All of the above calculations are, for the most part, based on simple interest.  The cumulative balances on Exhibit 21-U have been increased for accrued interest in only 8 of 22 possible annual periods.

interest in 14 of 22 possible instances. Further, petitioner has not provided any explanation as to why interest was not accrued at a fixed rate or why the rate purportedly[6] charged appears to be below market.

The only factors in this case that are helpful to petitioner and/or supportive of its argument are the partial repayments and the accrual of interest. Repayment of principal and accrual or payment of interest can be significant indicators of whether advances are loans or equity. Generally, shareholders place their money at the risk of the business while lenders seek a more reliable return. See Midland Distribs., Inc. v. United States, 481 F.2d 730, 733 (5th Cir. 1973). In the overall setting of this case, however, the repayments and interest accruals are insufficient to overcome the weight of the evidence reflecting that, in form and substance, neither petitioner nor its sister corporations intended the advances to be loans, nor did they treat them as loans.

Petitioner, Mr. Cerand, and the three sister corporations did not have a creditor-debtor relationship. The repayments were

---

[6] There has been no showing that interest was paid and/or that there was any fixed or legal obligation for the sister corporations to pay interest. Likewise, the sister corporations did not file returns, and no records were offered showing how they treated the repayments and/or whether they made charges against their revenues for interest expense.

merely book entries.  As soon as some amount was repaid to petitioner (always substantially less than had been advanced) petitioner would make another, usually larger advance to the sister corporations.  Significantly, we note that while the repayments were decreasing and the sister corporations' ability to repay was dwindling, petitioner continued to advance funds in progressively larger amounts.

It is important to note that no interest was actually paid to petitioner by the sister corporations.  In a similar manner to the repayments, the interest accruals appear to be an attempt to simulate the existence of debt.  We note that the accruals were limited, sporadic, and had no apparent fixed percentage.

As noted by the Court of Appeals for the D. C. Circuit, petitioner reported taxable income only in 2 of the years under consideration, 1986 and 1987.  In five of the periods in which interest was accrued by petitioner, the accrual of interest merely reduced petitioner's losses and did not result in taxable income.  Put another way, of the $175,662 of interest accrued and reported by petitioner, only $45,253 (about one-fourth) resulted in additional tax burden on petitioner.

When compared to the outstanding cumulative balance, the amount of interest accrued was substantially less in percentage than the going rate of interest during the period under consideration.  Again, no interest was actually paid by the

sister corporations, and while their ability to repay principal or to pay interest was decreasing, petitioner continued to advance ever-increasing amounts.

Petitioner's actions and the facts in this record do not portray the type of debtor-creditor relationship that petitioner must show to qualify for ordinary loss treatment under section 166, I.R.C. 1986. Considering the lack of intent evidenced by the manner in which repayment was made and interest accrued and the lack of objective evidence of debt, after reconsidering the evidence, we reach the same conclusion as we reached in Cerand I-- petitioner was an investor in the three sister corporations and is not entitled to debt treatment under section 166.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.